Samuel A. Schwartz
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

Kevin W. Kirsch (*pro hac vice*)
Andrew E. Samuels (*pro hac vice*)
Mark S. Einsiedel (*pro hac vice*)
Naomi Price (*pro hac vice*)
**Baker & Hostetler LLP**
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
Telephone: 614.228.1541

Kevin P. Flynn (*pro hac vice*)
**Baker & Hostetler LLP**
312 Walnut Street, Suite 3200
Cincinnati, OH 45202
Telephone: 513.929.3400

Jeffrey J. Lyons (*pro hac vice*)
**Baker & Hostetler LLP**
1201 N. Market Street, Suite 1407
Wilmington, DE 19801
Telephone: 302.407.4222

*Attorneys for Plaintiffs*
*Interblock d.o.o. and Interblock USA, L.C.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| INTERBLOCK D.O.O. and INTERBLOCK USA, L.C.,<br><br>Plaintiffs,<br><br>v.<br><br>MERKUR GAMING US, LLC, ADP MERKUR GMBH, and SPINTEC D.O.O.,<br><br>Defendants. | Case No.: 2:25-cv-01699-APG-EJY<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INDEX OF EXHIBITS

| # | **Document** |
|---|---|
| 1 | Merkur and Spintec joint announcement of partnership |
| 2 | Press release regarding the Nevada Gaming Commission's approval of Merkur's acquisition of Gaming Arts LLC |
| 3 | Merkur's August 21, 2025, announcement regarding 2025 Las Vegas Global Gaming Expo |
| 4 | Website for Merkur's exhibitor details at the 2025 Las Vegas G2E |
| 5 | U.S. Patent No. RE46,738 |
| 6 | https://www.youtube.com/watch?v=evplvc2QUnY |
| 7 | Spintec's LinkedIn post regarding infringing Charisma ETGs |
| 8 | Spintec's LinkedIn post regarding infringing Charisma ETGs to be featured at the 2025 Las Vegas G2E at the Spintec-Merkur booth |
| 9 | G3 Newswire's April 17, 2025, article titled "Merkur Spielbanken installs its 125th play station from Spintec" |
| 10 | Spintec's LinkedIn post regarding strengthening partnership with Merkur at PGS - Perú Gaming Show where infringing Charisma ETGs were shown |
| 11 | Global Gambling News's August 21, 2025, article titled "Merkur Group looks forward to G2E Las Vegas" |
| 12 | Spintec's LinkedIn post regarding Global Gambling News article and infringing Charisma ETGs to be featured at the 2025 Las Vegas G2E at the Spintec-Merkur booth with partner Merkur |
| 13 | Global Gambling News's September 24, 2025, article titled "Merkur Group – G2E Las Vegas Booths 3353 & 3650" |
| 14 | Gamingamericas.com's September 29, 2025, article titled "Merkur Group looks forward to G2E appearance in Las Vegas" |
| 15 | Spintec announcement regarding exhibition of infringing Charisma ETGs at the 2025 Las Vegas G2E |

| | |
|---|---|
| 16 | Focus Gaming News's October 17, 2025, article titled "Spintec and strategic partner Merkur Gaming celebrate G2E Las Vegas 2025's participation" |
| 17 | Spintec's LinkedIn post regarding Merkur-Spintec booth at 2025 Las Vegas G2E where infringing Charisma ETGs were exhibited |
| 18 | Merkur's LinkedIn post regarding Merkur-Spintec booth at 2025 Las Vegas G2E where infringing Charisma ETGs were exhibited |
| 19 | Spintec announcement regarding Merkur's and Spintec's strategic partnership since 2018 |
| 20 | Merkur webpage regarding most of its devices being manufactured by its long-standing partner Spintec |

Plaintiff Interblock d.o.o. and Interblock USA, L.C. (collectively "Interblock") hereby submit their Complaint for patent infringement against Merkur Gaming US, LLC ("Merkur US"), adp Merkur GmbH ("Merkur GmbH") (Merkur US and Merkur GmbH, collectively, "Merkur"), and SPINTEC d.o.o. ("Spintec") (Merkur and Spintec, collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1. This is an action for injunctive relief for Merkur's and Spintec's infringement of U.S. Patent No. RE46,738 ("'738 Patent"). Interblock seeks injunctive relief prohibiting any commercial exploitation, manufacture, use, or importation of Merkur's and Spintec's infringing dice electronic table games in the United States. Interblock further seeks damages for Merkur's and Spintec's infringement that has already occurred.

2. Interblock is a world-renowned and recognized company in the field of the development of electronic gaming devices, with over 34 years of experience. Casino operators around the world recognize Interblock as a leading developer and supplier of luxury gaming products. Interblock's gaming devices raise industry standards with their innovation and sophistication, providing its users with an exceptional experience. Interblock has been building its reputation, market recognition, and customer trust in its quality products and services for more than 34 years.

3. Interblock has built its reputation through hard work and substantial financial investments of capital, developing award-winning, cutting-edge gaming products. Interblock has developed new takes on traditional table games, such as craps, incorporating advanced gaming technology to create a transformative new gaming experience with the familiarity of traditional table games. Interblock's unique portfolio of electronic automated and semi-automated gaming machines and video gaming devices provides superior solutions for casinos, arcades, gaming halls, and gaming salons, offering guests a unique and unforgettable gaming experience. The Interblock brand is

recognized as synonymous with high-quality gaming solutions throughout the gaming world.

4. Interblock is the leading supplier of electronic gaming devices worldwide. Interblock provides its customers with the highest level of innovation, service, technology, and products that enable competitiveness in a changing market. Achieving this requires extraordinary effort, financial resources, investment in personnel, technology and intellectual property.

5. Interblock's exceptional product development and innovation place it at the forefront of the gaming industry. Over the years, together with its subsidiaries, it has introduced numerous revolutionary products, such as the Diamond generation of games, the Organic generation of gaming devices, Hologram Gaming Lounge, Stadium, Smart Pit, Standalone, Stadium and Pulse Arena, Universal Cabinet, ARUZE Legacy Electronic Table Games ("ETGs"), and many others. As of this filing, Interblock owns more than 360 issued U.S. patents and 244 other pending patent applications.

6. Interblock makes, uses, sells and offers for sale innovative dice ETGs including, e.g., Shoot to Win Craps, Dragon Sic-Bo, Universal Cabinet Craps, Universal Cabinet Crapless Craps, and Universal Cabinet Sic-Bo.









7. For example, Interblock's Shoot to Win Craps is a novel electronic adaptation of the game of craps. The electronic adaptation offers players an intuitive and user-friendly way to place bets and roll the dice. This electronic version simplifies the betting process and provides a dynamic environment. Innovative software enables improved dice detection and advanced security with new dice. The latest camera system adds top-notch support. Each gaming terminal includes a shooter button for a user to throw the dice, creating a seamless gaming experience. Software solutions allow gameplay to be tailored to player preferences with flexible settings for odds, commissions, simultaneous bets, jackpot features, and more. Innovative industrial design brings all of this together and enables improved configuration, seamlessly integrated.

8. As another example, Interblock's Dragon Sic-Bo is a novel electronic adaptation of the dice game Sic-Bo. The electronic adaptation offers a variety of betting options, making this product attractive and visually impressive for players. The innovative industrial design with padded panels visible from all sides displays the game history and flying dragons, while the round sign visible from all sides allows the game history and

flying dragons to be displayed. The number of stations can be changed according to customer requirements.

9. Interblock holds the preeminent market position for ETG dice games through its sales of products covered by the ’738 Patent, including, e.g., Shoot to Win Craps and Dragon Sic-Bo.

10. Interblock is now seriously threatened by the actions of Defendants. In the wake of Interblock’s success in the ETG dice game market, Merkur and Spintec plan to release and, upon information and belief, have already released, a highly similar, infringing line of multiplayer ETGs with mechanical dice movement and a “Shooter” button. In the following images, Interblock’s multiplayer ETGs with mechanical dice movement and a “Shooter” button are shown on the left, while Merkur’s and Spintec’s infringing multiplayer ETGs with mechanical dice movement and a “Shooter” button are shown on the right.

| | |
|---|---|
|   |   |
| **Interblock’s Patented Multiplayer Craps ETG** | **Merkur’s and Spintec’s Infringing Multiplayer Craps ETG** |

|  |   |
|---|---|
| **Interblock's Patented Multiplayer Sic-Bo ETG** | **Merkur's and Spintec's Infringing Multiplayer Sic-Bo ETG** |

11. On October 4, 2024, the "Merkur Group and Spintec" jointly announced a "long-term strategic partnership" which "aims to tap into new gaming markets," identifying Merkur GmbH as "the responsible subsidiary of the Merkur Group" for "the strategic partnership." **Exhibit 1** is a true and correct copy of the announcement.

12. An April 17, 2025, article in G3 Newswire titled "Merkur Spielbanken installs its 125th play station from Spintec" refers to "a close and strategic collaboration between Merkur Spielbanken, Merkur Gaming, and Spintec's product management and development teams." **Exhibit 9** is a true and correct copy of the article.

13. A Spintec social-media post from June 2025 referred to Spintec having taken "an important step in strengthening our partnership with MERKUR GAMING" and "the PGS - Perú Gaming Show" where "our #Karma and #Charisma product lines turned heads with their unbeatable combination of innovation, reliability and engaging design." Spintec also noted "this new agreement underlines the synergy between Merkur's strong regional presence and Spintec's technological leadership in ETGs. It is also a clear sign

of our shared vision to push boundaries and grow together." **Exhibit 10** is a true and correct copy of this social media post.

14. In or around May 2025, Merkur US secured a license to manufacture and distribute gaming products in the state of Nevada. The press release also announced the Nevada Gaming Commission's approval of Merkur US's acquisition of its "trusted strategic partner," Gaming Arts LLC. **Exhibit 2** is a true and correct copy of the press release.

15. On August 21, 2025, Merkur announced its appearance at the 2025 Las Vegas Global Gaming Expo ("G2E") from October 7–9, 2025. Merkur highlighted that its "strategic partner and Slovenian ETG [electronic table game] specialist Spintec" would be sharing Merkur's exhibition space. **Exhibit 3** is a true and correct copy of the announcement. The text of Merkur's announcement, including the quote about Spintec, was also in an August 21, 2025, article in Global Gambling News titled "Merkur Group looks forward to G2E Las Vegas." **Exhibit 11** is a true and correct copy of this Global Gambling News article. A Spintec social-media post also included a link to this Global Gambling News article and stated, "Charisma takes the Vegas stage. From October 7-9, we're live at G2E Las Vegas with our award-winning #Charisma line and partner MERKUR GAMING. Join us and watch Charisma steal the show in Vegas." **Exhibit 12** is a true and correct copy of this social media post.

16. The website for the 2025 Las Vegas G2E indicates that Merkur and Spintec would in fact be sharing exhibition space and jointly exhibiting gaming products and stated "Visit us at our booth in Las Vegas and experience the world of Merkur" and "Brands we will feature MERKUR Gaming, Spintec, Gaming Arts, GeWeTe, Bede Gaming." **Exhibit 4** is a true and correct copy of the website for Merkur's exhibitor details at the 2025 Las Vegas G2E.

17. The 2025 Las Vegas G2E was held in Las Vegas, Nevada, on October 6–9, 2025. G2E had nearly 400 exhibitors and around 25,000 attendees. Interblock exhibited

its products at G2E, and Defendants announced they intended to exhibit their products. A Spintec social-media post from September 2025 advertised the Spintec-Merkur booth where attendees could see the infringing Charisma ETG: "Come visit us and our partner MERKUR GAMING at Booth #3353 at The Venetian Expo, Oct 7–9" and "Meet Charisma at G2E show in Las Vegas Booth #3353 | October 7-9, 2025." **Exhibit 8** is a true and correct copy of this social media post. The Las Vegas G2E is the most significant exhibition and sales event in the gaming industry. Representatives from about 750-800 casinos globally, those casinos representing over 95% of Interblock's revenue, visited Interblock's booth at the 2025 Las Vegas G2E. New casinos not currently customers of Interblock, and representatives of customers in new markets, visited Interblock's and, on information and belief, Spintec's and Merkur's booths. Exclusivity in the automated dice ETG technologies covered by the '738 Patent is critical to Interblock's strategic operations. Products embodying the patented technologies, including Dragon Sic-Bo and the Shoot-to-Win ETGs are Interblock's highest-earning ETGs. For Interblock and much of the gaming industry, the Las Vegas G2E annually is the event where customer and distributor deals are made. As advertised on G2E's website, "G2E is the catalyst for gaming – fostering innovation and driving growth by convening the global industry in one place to get business done."

18. A September 24, 2025, article in Global Gambling News titled "Merkur Group – G2E Las Vegas Booths 3353 & 3650" stated, "Joining Merkur Gaming are subsidiaries and partners such as Gaming Arts, presenting new products like Glory of Giza, and GeWeTe, offering advanced cash handling solutions. Bede Gaming will introduce its high-performance platform, and Spintec will display its Charisma line of electronic table games." **Exhibit 13** is a true and correct copy of this article.

19. A September 29, 2025, article on Gamingamericas.com titled "Merkur Group looks forward to G2E appearance in Las Vegas" stated, "Also returning to the Merkur exhibition space is strategic partner and Slovenian ETG specialist Spintec,

showcasing an extensive portfolio of electronic table games. Their latest Charisma line features a diverse range of automated, virtual/video, and live games, including Roulette, Blackjack, Baccarat, Craps, and Sic Bo. Recognized as the Best ETG in Asia and proven to be a top-performing ETG in Western Europe and LATAM, Charisma has set new benchmarks for excellence in electronic table gaming." **Exhibit 14** is a true and correct copy of this article.

20. Spintec and Merkur make, use, sell, offer for sale and/or import into the United States automated dice games, including craps and sic-bo, under the Charisma line of products. Defendants' automated dice games feature a dice movement generator that automatically throws real dice in a clear enclosure.

21. On October 20, 2025, Spintec announced it had exhibited its "Charisma Series" products at the 2025 Las Vegas G2E "with its strategic partner Merkur Gaming." Spintec's announcement remarks that the "the Charisma Craps technology" "invited a lot of attention" by "exhibit[ing] extremely smooth gameplay with exciting dice rolls and fast, accurate number reading, maintaining the thrill of traditional craps while enhancing efficiency." Spintec also highlighted the Charisma Craps's "Shooter Button," describing it as a "standout element" and "a fun and interactive feature that assigns the shooter role in accordance with authentic live game rules." Spintec further described "Charisma Craps also incorporates a proprietary solution that guarantees clean, fair rolls by preventing dice from becoming cocked or landing on top of each other." **Exhibit 15** is a true and correct copy of the announcement. The text of Spintec's announcement was also in an October 17, 2025, article in Focus Gaming News titled "Spintec and strategic partner Merkur Gaming celebrate G2E Las Vegas 2025's participation." **Exhibit 16** is a true and correct copy of this Focus Gaming News article.

22. A Spintec social-media post from October 2025 reflected on the booth where attendees could see the infringing Charisma ETG and Spintec was joined by

"partners MERKUR GAMING, Dynamic Gaming Solutions, LLC and Gaming Arts, LLC." **Exhibit 17** is a true and correct copy of this social media post.

23. A Merkur social-media post from October 2025 also advertised the Spintec-Merkur booth where attendees could see the infringing Charisma ETG, including a large display of the MERKUR GAMING, GamingArts, and Spintec logos. **Exhibit 18** is a true and correct copy of this social media post.

24. On information and belief, "Spintec and Merkur Gaming are strategic partners in the area of electronic table games manufacturing since 2018." **Exhibit 19** is a true and correct copy of a May 16, 2023, announcement from Spintec announcing this longstanding strategic partnership.

25. On information and belief, Merkur owns and operates a website at www.merkur.com. Merkur's website represents that "[m]ost of our devices are manufactured by Spintec, with whom we have a long-standing partnership. You will find 125 virtual gaming stations from Spintec at six MERKUR Casino locations . . . " **Exhibit 20** is a true and correct copy of this webpage from Merkur's website.

26. On information and belief, Merkur GmbH is responsible for the development, production and distribution of games and entertainment devices within the Merkur Group, and Merkur US and Merkur GmbH are subsidiaries of Merkur Group.

27. Defendants' multiplayer Charisma ETGs with mechanical dice movement and a "Shooter" button ("Accused Products") infringe one or more claims of the '738 Patent.

28. Defendants have begun attempts to sell the Accused Products to casinos across the United States.

29. Defendants have recently begun promoting the Accused Products heavily on social media and through public relations campaigns, attempting to generate significant buzz for the Accused Products in the gaming industry.

30. Defendants have recently approached game distributors and casino operators, pitching the Accused Products as a lower-cost alternative to Interblock's highly successful automated dice games. Defendants further indicated to casino operators that they were officially launching the Accused Products at least as early as at the 2025 Las Vegas G2E, including via social media. Defendants featured the Accused Products in Merkur's exhibition space at the 2025 Las Vegas G2E. A September 9, 2025 social media post by Spintec offered potential customers to "Meet charisma at G2E show in Las Vegas Booth # 3353 October 7-9, 2025" along with the hashtag #areyoufeelingcharismatic, a picture of which is shown below. The exhibitions of the Accused Products at the 2025 Las Vegas G2E, where nearly the entire gaming industry was represented and nearly all of Interblock's customers were present, gravely threatened and continues to threaten Interblock's customer base and business strategies focused on growth in automated dice ETGs embodying patented technologies.




31. Defendants are attempting to directly compete with Interblock's automated dice games, a market in which Interblock is well established in both numbers of sales and reputation as an innovator and reliable company. Interblock conservatively estimates that it maintains a 90% or greater market share with respect to ETG dice games in the U.S.

32. Through its hard work and innovation, Interblock has released a complete lineup of highly successful dice games, including Diamond Sic-Bo, Diamond Craps, Diamond Crapless Craps, Diamond Easy Craps, Dragon Sic-Bo, Shoot to Win Craps, Diamond Pick to Win Craps, Interblock Stadium, Interblock Pulse Arena, Universal Cabinet Craps, Universal Cabinet Crapless Craps, Universal Cabinet Easy Craps, and Universal Sic-Bo.

33. Recent Spintec advertising confirms that irreparable harm to Interblock is imminent. On LinkedIn, Spintec's account posted numerous stacked, wooden crates in what appears to be an airport, stating: "Ready for takeoff. Packed with power, heading straight across the ocean, U.S. casinos, get ready: #Charisma is coming." The Spintec advertising confirms that the U.S. market is about to be flooded with the Accused Products. **Exhibit 7** is a true and correct copy of the LinkedIn post, which is copied below:




34. On information and belief, the Accused Products will be offered for sale at a discount relative to Interblock's dice ETGs. Further, on information and belief, each sale of the Accused Products will be a sale that Interblock could have and would have captured but for the lower price of the Accused Products. On information and belief, the discounted price of the Accused Products relative to Interblock's dice ETGs will force

Interblock to lower its prices to compete with the Accused Products, and such lowered prices, once lowered, will likely be permanently eroded.

## PARTIES

35. Interblock d.o.o. is a Slovenian limited liability company located at Gorenjska cesta 23, 1234 Menges, Slovenia.

36. Interblock USA, L.C. is a subsidiary of Interblock d.o.o. that distributes Interblock's dice ETGs in the United States. Interblock USA, L.C. is a Nevada limited liability company headquartered at 6900 S. Decatur Blvd., Suite 100, Las Vegas, NV 89118.

37. Merkur US is a Nevada limited liability company. Its Manager is Jochen Clemens, whose business address is Merkur-Allee, 1-15, Espelkamp, 32339, Germany. Merkur US is a subsidiary of the Merkur Group, located in Espelkamp, Germany.

38. Merkur GmbH is a German limited liability company located at Merkur-Allee 1-15, 32339 Espelkamp, Germany. Merkur GmbH is a subsidiary of the Merkur Group, located in Espelkamp, Germany.

39. Spintec is a Slovenian limited liability company located at Volčja Draga 43D, 5293 Volčja Draga, Slovenia.

## JURISDICTION, VENUE, AND JOINDER

40. This is an action arising under the Patent Act and specifically for patent infringement under 35. U.S.C. § 271. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

41. This Court has general jurisdiction over Merkur US because Merkur US was formed in Nevada. This Court also has specific personal jurisdiction over Merkur US because Merkur US has availed itself of the privileges of transacting business in the State of Nevada, secured a license from the Nevada Gaming Commission to manufacture and distribute gaming devices, and purchased exhibition space and exhibited at the 2025 Las Vegas G2E.

42. This Court has personal jurisdiction over Merkur GmbH because Merkur GmbH has availed itself of the privileges of transacting business in the State of Nevada. At a minimum, Merkur GmbH was exhibiting, using, and soliciting sales for the Accused Products at the 2025 Las Vegas G2E, which constitutes patent infringement occurring in the State of Nevada.

43. This Court has personal jurisdiction over Spintec because Spintec has availed itself of the privileges of transacting business in the State of Nevada. At a minimum, Spintec was exhibiting, using, and soliciting sales for the Accused Products at the 2025 Las Vegas G2E, which constitutes patent infringement occurring in the State of Nevada.

44. Merkur US, Merkur GmbH, and Spintec have sufficient minimum contacts with Nevada because their business activities directed into Nevada, including exhibiting, using, and soliciting sales of the Accused Products at the 2025 Las Vegas G2E, resulted in patent infringement, giving rise to the causes of action asserted in this Complaint. Because of these minimum contacts, the exercise of jurisdiction satisfies due process. Nevada's long-arm statute allows the exercise of jurisdiction in a manner not inconsistent with the Constitution.

45. Venue is proper as to Merkur US under 28 U.S.C. § 1400(b) because Merkur US resides in this district.

46. 28 U.S.C. § 1391 governs venue applied to foreign defendants including Merkur GmbH and Spintec. Under 28 U.S.C. § 1391(b), venue is proper as to Merkur GmbH and Spintec in this district.

47. Joinder of Merkur US, Merkur GmbH, and Spintec is appropriate. Merkur US and Merkur GmbH are subsidiaries of the Merkur Group. On information and belief, Merkur and Spintec jointly exhibited the Accused Products at the 2025 Las Vegas G2E and within the last year announced a "long-term strategic partnership." Merkur US recently secured a Nevada gaming license and has since been selling Spintec games.

Merkur's website represents that most of its devices are manufactured by Spintec. Merkur and Spintec have also recently solicited Interblock's customers (both casino operators and gaming distributors), indicating a launch of the Accused Products and attempt to undercut Interblock's pricing on automated dice games. Further, on information and belief, the formal launch of the Accused Products occurred at least as early as the 2025 Las Vegas G2E (via Merkur's and Spintec's shared exhibition space). Accordingly, the claims against Merkur US, Merkur GmbH, and Spintec involve the same Accused Products, the same set of transactions and occurrences, and Merkur US's, Merkur GmbH's, and Spintec's efforts to advance their long-term strategic partnership through offering new products that infringe Interblock's patent rights. Questions of fact common to Merkur US, Merkur GmbH, and Spintec will arise in this action.

**THE '738 PATENT**

48. On February 27, 2018, the U.S. Patent and Trademark Office duly and legally reissued the '738 Patent, titled "Gaming Machine with Dice Shaking Unit Performing Dice Shaking Motions with Varying Amplitudes." A true and correct copy of the '738 Patent is attached as **Exhibit 5**.

49. Interblock d.o.o. owns the '738 Patent. Interblock USA, L.C. is the exclusive licensee of the '738 Patent.

50. Interblock makes, uses, sells and/or offers for sale ETG dice games including, e.g., Shoot to Win Craps and Dragon Sic-Bo. These products are each covered by at least one claim of the '738 Patent.

51. The '738 Patent is valid, is enforceable, and claims patentable subject matter.

52. The '738 Patent is directed to improved gaming systems implementing dice, such as craps and sic-bo, and related methods. Systems according to the '738 Patent enable games such as craps and sic-bo to be played without dealers while achieving sufficient durability and randomness and providing an improved user experience.

## INTERBLOCK'S PATENTED GAMING SYSTEMS

53. Interblock makes and sells gaming systems covered by the patents asserted in this Complaint. Specifically, Interblock makes and sells its innovative and highly successful dice games, which incorporate technologies covered by one or more claims of the '738 Patent.

54. Interblock's dice games incorporating technologies covered by the '738 Patent include, e.g., Shoot to Win Craps and Dragon Sic-Bo.

55. Interblock has spent many millions of dollars in development costs for its innovative dice games.

56. Interblock's revenues in the United States for its innovative dice games is well into the tens of millions of dollars. Interblock's patented technologies have driven demand for and created a highly successful line of automated dice game products.

57. Interblock has never licensed the '738 Patent to any third party.

58. Interblock is the preeminent provider of automated ETG dice games in the United States. Interblock intends to preserve its exclusivity in the market for automated dice games that practice claims of the '738 Patent.

## COUNT I: DIRECT INFRINGEMENT OF THE '738 PATENT

59. Interblock incorporates the foregoing paragraphs by reference as if fully set forth herein.

60. Merkur and Spintec announced their exhibition and launch of the Accused Products at least as early as at the 2025 Las Vegas G2E, which took place from October 6–9, 2025.

61. Merkur and Spintec have imported into and have used in the United States (including at the 2025 Las Vegas G2E) the Accused Products. Merkur and Spintec have also commercially exploited the Accused Products to casino operators and gaming distributors in the United States to undercut Interblock's profits and take Interblock's customers.

62. Merkur's and Spintec's commercial efforts in support of their formal launch of the Accused Products have harmed Interblock by inducing Interblock's customers to postpone agreements for Interblock's patented automated dice games and risk further harm if Merkur and Spintec secure agreements to provide the Accused Products and displace Interblock's profits.

63. Interblock is the preeminent provider of automated dice games in the United States gaming industry. Due to Merkur's and Spintec's launch of the Accused Products at least as early as at the 2025 Las Vegas G2E, Interblock's market position has been irreparably harmed.

64. Limited information about the operation of the Accused Products, which feature an infringing dice movement generator, is publicly available. The examples of Accused Products described herein are craps ETGs but other ETGs, such as Sic-Bo, can also meet the definition of Accused Products.

65. The images below illustrate potential examples of Accused Products being promoted online. The screenshot on the left is from a YouTube video available at https://www.youtube.com/watch?v=evplvc2QUnY. Upon information and belief, this video was taken at the Indian Gaming Tradeshow & Convention held in April 2025 in San Diego, California and shows an Accused Product operating in an infringing configuration. On information and belief, the infringing configuration in the video is the "Attract Configuration." The screenshot on the right is from the www.spintecgaming.com website. The Accused Products include an automatic dice movement generator surrounded by multiple player stations, as shown below:







66. Upon information and belief, the Accused Products have an automatic dice movement generator, which drives a shaker plate on which the dice rest. The shaker plate rotates and moves up and down, which imparts a motion upon the dice, causes the dice to shake, and ultimately makes the dice jump differently or by a higher amount, mimicking the dice being thrown.

67. The Accused Products infringe at least one claim of the ’738 Patent.

68. For example, claim 5 of the ’738 Patent recites a gaming system.

69. The Accused Products are gaming systems and feature versions of casino dice games such as craps and sic-bo.

70. Claim 5 of the ’738 Patent further recites a dice movable unit having a plurality of dice and a shaking device that causes the plurality of dice to roll.

71. The Accused Products include a dice movable unit having a plurality of dice and a shaking device with an automatic dice movement generator driving a shaker plate for imparting motion to the plurality of dice, thereby causing the plurality of dice to roll.




72. Claim 5 of the ’738 Patent further recites a plurality of game terminals, each of the plurality of game terminals having an operation device that a player can operate.

73. The Accused Products include a plurality of game terminals, each of the plurality of game terminals having an operation device that a player can operate.

74. Upon information and belief, the Accused Products are currently available with four, six, or eight game terminals, each having its own “Shooter” button that a corresponding player can operate.




75. Claim 5 of the '738 Patent further recites a controller that executes processing of: (a) receiving bet end signals from the betted terminals among the plurality of game terminals, each of the bet end signals indicating betting in a corresponding betting terminal has ended.

76. The Accused Products include a controller that executes processing of: (a) receiving bet end signals from the betted terminals among the plurality of game terminals, each of the bet end signals indicating betting in a corresponding betting terminal has ended.

77. Upon information and belief, the Accused Products include multiple configurations that may be changed by changing settings in the software loaded on the Accused Products or the configuration of certain parameters within the Accused Products. The Accused Products are operable in at least an "Attract Configuration" and a "Realistic Configuration."

78. When the Accused Products are operated in either the "Attract Configuration" or the "Realistic Configuration," players can place bets via corresponding game terminals.

79. Upon information and belief, when the Accused Products are operated in the "Attract Configuration," players can place bets via corresponding game terminals until a game timer terminates the betting period for all players. The controller knows when the betting period ends based on the game timer. The game terminals signal the controller when bets are placed so that, at least when the betting period ends, the controller knows at which of the game terminals bets have been placed and betting has ended and at which of the game terminals no bets have been placed. After the betting period has ended, the controller designates one of the betted game terminals to be the "Shooter" terminal, which allows the corresponding player to operate the "Shooter" button on the "Shooter" terminal.

80. Upon information and belief, when the Accused Products are operated in the "Realistic Configuration," each game terminal of the Accused Products also includes a "Ready" button. Prior to a game timer terminating the betting period for all players, each player can actuate his or her "Ready" button when the player has placed all of his or her desired bets, thereby indicating betting at the player's game terminal has ended. When a player actuates his or her "Ready" button, a bet end signal is received by the controller from the corresponding betted game terminal indicating betting in that betted game terminal has ended.

81. The Accused Products encourage players to finish their bets with a "Hurry Up" message and provide a visual indication when the betting period has been terminated by the game timer:[1]

---

[1] The screenshots provided herein are from a YouTube video showing operation of an Accused Product available at https://www.youtube.com/watch?v=evplvc2QUnY. Upon information and belief, this video was taken at the Indian Gaming Tradeshow &







82. Claim 5 of the '738 Patent further recites a controller that executes processing of: (b) transmitting a first motion start signal, which causes a first motion by the shaking device to start, to the dice movable unit;

83. The Accused Products include a controller that executes processing of: (b) transmitting a first motion start signal, which causes a first motion by the shaking device to start, to the dice movable unit:

---

Convention held in April 2025 in San Diego, California and appears to show an Accused Product operating in the "Attract Configuration."

| Dice on Stationary Shaker Plate | Dice While Dice Generator Performs First Motion |
|---|---|
|  |   |

84. Upon information and belief, when the Accused Products are operated in the "Attract Configuration," the shaker plate on which the dice rest starts to rotate and shake during the betting period. The shaker plate begins to rotate and shake in response to a first motion start signal transmitted by the controller to the dice movement generator, thereby causing the rotation and shaking of the shaker plate to start.

85. Upon information and belief, when the Accused Products are operated in the "Realistic Configuration," the shaker plate on which the dice rest starts to rotate and performs a determined number of bumps in response to actuation of the "Shooter" button of the designated "Shooter" terminal. The shaker plate begins to rotate and performs the determined number of bumps in response to a first motion start signal transmitted by the controller to the dice movement generator, thereby causing the rotation of the shaker plate to start and the shaker plate to perform the determined number of bumps.

86. Claim 5 of the '738 Patent further recites a controller that executes processing of: (c) transmitting a permission signal, which permits an operation by the operation device of a predetermined game terminal of the betted terminals, to the predetermined game terminal.

87. The Accused Products include a controller that executes processing of: (c) transmitting a permission signal, which permits an operation by the operation device of a predetermined game terminal of the betted terminals, to the predetermined game terminal.

88. Upon information and belief, when the Accused Products are operated in the "Attract Configuration" or the "Realistic Configuration," the controller designates one of the betted game terminals to be the "Shooter" terminal. When the controller designates a "Shooter" terminal, the controller transmits a permission signal to that designated "Shooter" terminal, which permits the corresponding player to operate the "Shooter" button on the "Shooter" terminal.


New shooter button

A fun game feature where the shooter rotates clockwise among play stations or follows live game rules, continuing until a 7-out or point is hit.

89. Claim 5 of the '738 Patent further recites a controller that executes processing of: (d) receiving an operation signal, which indicates that the operation device has been operated, from the predetermined game terminal.

90. The Accused Products include a controller that executes processing of: (d) receiving an operation signal, which indicates that the operation device has been operated, from the predetermined game terminal.

91. Upon information and belief, when the Accused Products are operated in the "Attract Configuration" or the "Realistic Configuration," when the corresponding player at the designated "Shooter" terminal operates the "Shooter" button on the "Shooter" terminal, the controller receives an operation signal from the designated "Shooter" terminal indicating that the "Shooter" button has been operated.




92. Claim 5 of the ’738 Patent further recites a controller that executes processing of: (e) transmitting a second motion start signal, which causes a second motion by the shaking device to start, to the dice movable unit in response to the operation signal.

93. The Accused Products include a controller that executes processing of: (e) transmitting a second motion start signal, which causes a second motion by the shaking device to start, to the dice movable unit in response to the operation signal.

94. Upon information and belief, when the Accused Products are operated in the “Attract Configuration,” in response to operation of the “Shooter” button of the designated “Shooter” terminal, the shaker plate executes a bump and then a settling motion. The shaker plate executes the bump and the settling motion in response to a

second motion start signal transmitted by the controller to the dice movement generator, thereby causing the shaker plate to execute the bump and the settling motion, and the second motion start signal is transmitted by the controller to the dice movement generator in response to operation of the "Shooter" button of the designated "Shooter" terminal.

95. Upon information and belief, when the Accused Products are operated in the "Realistic Configuration," in response to operation of the "Shooter" button of the designated "Shooter" terminal, the shaker plate executes a settling motion. The shaker plate executes the settling motion in response to a second motion start signal transmitted by the controller to the dice movement generator, thereby causing the shaker plate to execute the settling motion, and the second motion start signal is transmitted by the controller to the dice movement generator in response to operation of the "Shooter" button of the designated "Shooter" terminal.

**Dice When Dice Movement Generator Performs Second Motion**



96. Claim 5 of the ’738 Patent further recites wherein the dice movable unit: (b1) starts the first motion in response [to] having received the first motion start signal from the controller.

97. The Accused Products include that the dice movable unit: (b1) starts the first motion in response [to] having received the first motion start signal from the controller.

98. Upon information and belief, when the Accused Products are operated in the “Attract Configuration,” the dice movement generator causes the rotation and shaking of the shaker plate to start in response to having received the first motion start signal from the controller during the betting period.

99. Upon information and belief, when the Accused Products are operated in the “Realistic Configuration,” the dice movement generator causes the rotation of the shaker plate and performs the determined number of bumps in response to having received the first motion start signal from the controller.

| Dice on Shaker Plate Before Receiving First Motion Start Signal | Dice After Receiving First Motion Start Signal |
|---|---|
|  |  |

100. Claim 5 of the ’738 Patent further recites wherein the dice movable unit: (e1) performs the second motion, which is different from the first motion, in response to having received the second motion start signal from the controller.

101. The Accused Products include that the dice movable unit (e1) performs the second motion, which is different from the first motion, in response to having received the second motion start signal from the controller.

102. Upon information and belief, when the Accused Products are operated in the “Attract Configuration,” the shaker plate executes the bump and the settling motion in response to having received the second motion start signal from the controller after operation of the “Shooter” button of the designated “Shooter” terminal. Both the bump and the settling motion performed in response to the second motion start signal are different from the rotation and shaking of the shaker plate performed in response to the first motion start signal.

103. Upon information and belief, when the Accused Products are operated in the “Realistic Configuration,” the shaker plate executes the settling motion in response to having received the second motion start signal from the controller after operation of the “Shooter” button of the designated “Shooter” terminal. The settling motion performed in response to the second motion start signal is different from the rotation and determined number of bumps of the shaker plate performed in response to the first motion start signal.

104. As shown, the Accused Products include each limitation of at least claim 5 of the ’738 Patent. The Accused Products thus infringe, either literally or under the doctrine of equivalents, at least claim 5 of the ’738 Patent.

105. Defendants have formed a long-term strategic partnership, which they have publicly announced. Merkur’s website states that most of its gaming devices are manufactured by Spintec. Merkur and Spintec have shared exhibition space and jointly exhibited gaming products in Nevada, including at the annual G2E trade show, for at least the last two years. Further, Merkur US is the only defendant possessing a Nevada Gaming

Commission Manufacturer or Distributor license. On information and belief, Defendants intend to leverage Merkur US's Nevada Gaming Commission licenses to sell the Accused Products to Nevada casinos. Under the circumstances, Defendants have formed a joint enterprise, and each is liable for direct infringement.

106. The Defendants' infringement (including through their solicitation of sales of the Accused Products to casino operators and gaming distributors and their exhibition, use, and solicitation of sales for the Accused Products at the 2025 Las Vegas G2E) has damaged Interblock and, if not enjoined from further manufacture, use, sale, offer for sale, or importation will irreparably harm Interblock, including by taking Interblock's hard-earned market share for automated dice games incorporating Interblock's innovative, patented dice-throwing systems and methods.

107. The Defendants, on the one hand, and Interblock, on the other, are direct competitors in the gaming market, including the specific market for ETGs. The Defendants should be enjoined from further infringement of the '738 Patent. Interblock has spent years developing, refining, and patenting its proprietary dice-control systems and methods, which have been successfully implemented in Interblock's automated dice games. Should the Defendants be permitted to continue infringing Interblock's patented inventions, Interblock will be forced to compete against its own innovation over which it has the right to exclude others. Basic fairness should not allow this to continue, particularly at an early stage where the Defendants have not yet gained significant market share but are actively attempting to establish a sales pipeline for the Accused Products in the hopes of taking market share from Interblock. The Defendants' continued infringement will cause (1) loss of business opportunities and market share; (2) significant and irreversible price erosion; (3) loss of customer goodwill and harm to Interblock's reputation; and (4) a diversion of resources from research and development. Moreover, the features patented in the '738 Patent drive demand for Interblock's automated dice

games and ensure durable, sufficiently random dice games to be played without stickmen, boxmen, croupiers, or dealers.

108. Additionally, as evidenced by its pre-launch solicitation of Interblock's customers—which led some customers to postpone deals with Interblock pending the Defendants' launch at the 2025 Las Vegas G2E—the Defendants are aggressively attempting to take market share from Interblock through their offering of the Accused Products. The Defendants have already damaged Interblock, and allowing the Defendants to launch, offer for sale, and sell the Accused Products unfairly and irreparably damages Interblock, including through a loss of market share and customers.

109. Interblock's damages are difficult to quantify, rendering monetary damages an inadequate remedy for Interblock. Interblock is the preeminent provider of multiplayer automated mechanical ETG dice games with shooter buttons in the United States. Allowing Merkur and Spintec to infringe the '738 Patent would unfairly deny Interblock its right to exclude others.

110. The public interest favors an injunction to maintain the status quo and protect Interblock's investment in developing new and innovating gaming technologies. The public interest further favors immediate injunctive relief to enforce the Patent Act's statutory right to exclude others from practicing Interblock's patented inventions that Interblock has successfully brought to market.

111. Accordingly, the circumstances of this case warrant injunctive relief barring the Defendants from further infringement of the '738 Patent. The Defendants should specifically be enjoined from exhibiting, offering for sale, and selling the Accused Products pending trial.

112. The Defendants' infringement, particularly through their solicitation of Interblock's customers and representation that the Accused Prodcuts are a cheaper alternative to Interblock's patented automated dice games, warrants a finding that this is an exceptional case, entitling Interblock to recover its attorneys' fees and expenses.

## PRAYER FOR RELIEF

Accordingly, Interblock respectfully requests that the Court enter judgment in its favor, granting it the following relief:

A. Entry of a judgment that the Defendants' exhibition, use, and solicitation of sales of the Accused Products at least at the 2025 Las Vegas G2E infringed the '738 Patent under 35 U.S.C. § 271(a);

B. Entry of a judgment that any manufacture, use, sale, offer for sale, and importation of the Accused Products infringe the '738 Patent under 35 U.S.C. § 271(a);

C. Entry of a preliminary injunction and permanent injunction enjoining the Defendants and their officers, directors, employees, agents, consultants, contractors, suppliers, distributors, affiliates, and all others acting in privity with the Defendants from further infringement of the '738 Patent, including through sales, offers for sale, importation, use, or manufacture of the Accused Products;

D. Entry of an award to Interblock of damages to compensate it for the infringement of the '738 Patent by the Defendants, in an amount to be proven at trial, together with pre-judgment and post-judgment interest and costs, as fixed by the Court;

E. Entry of a finding that, with respect to the Defendants, this case has been exceptional and awarding to Interblock its reasonable costs and attorney fees under 35 U.S.C. § 285;

F. Entry of judgment that the Defendants' infringement has been willful and trebling the award of damages to Interblock;

G. Entry of judgment against the Defendants on all counts of this Complaint;

H. Entry of an award to Interblock of its costs in this action; and

H. A grant to Interblock of additional relief that the Court sees as just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Interblock demands trial by jury on all issues so triable.

Dated: November 14, 2025

SCHWARTZ LAW, PLLC

/s/ DRAFT

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
601 East Bridger Avenue
Las Vegas, Nevada 89101

Kevin W. Kirsch (*pro hac vice*)
Andrew E. Samuels (*pro hac vice*)
Mark S. Einsiedel (*pro hac vice*)
Naomi Price (*pro hac vice*)
**Baker & Hostetler LLP**
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
Telephone:614.228.1541

Kevin P. Flynn (*pro hac vice*)
**Baker & Hostetler LLP**
312 Walnut Street, Suite 3200
Cincinnati, OH 45202
Telephone:513.929.3400

Jeffrey J. Lyons (*pro hac vice*)
**Baker & Hostetler LLP**
1201 N. Market Street, Suite 1407
Wilmington, DE 19801
Telephone:302.407.4220

*Attorneys for Interblock*